596 F.2d 428
 5 Bankr.Ct.Dec. 188, Bankr. L. Rep. P 67,125,
26 UCC Rep.Serv. 562
 In the Matter of Thomas AMADOR, Bankrupt.
Alex WITH, Plaintiff-Appellee,
v.
Thomas AMADOR, Defendant-Appellant.
In the Matter of Roy A. VAUGHAN a/k/a Roy Alexander Vaughan,
Bankrupt.
Alex WITH, Plaintiff-Appellee,
v.
Roy A. VAUGHAN a/k/a Roy Alexander Vaughan, Defendant-Appellant.
 Nos. 77-2028, 77-2029.
 United States Court of Appeals,
Tenth Circuit.
 Submitted March 15, 1979.
Decided April 13, 1979.
 
 Floyd Wilson of Ahern, Montgomery & Pongetti, Albuquerque, N. M., for defendant-appellant.
 Paul M. Fish of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., for plaintiff-appellee.
 Before HOLLOWAY, BARRETT, Circuit Judges, and MILLER, Judge.*
 MILLER, Judge.
 
 
 1
 Appellants filed petitions for bankruptcy with the United States Bankruptcy Court for the District of New Mexico. Appellee filed complaints in each of the bankruptcy proceedings for a determination that the bankrupts' debts to him were nondischargeable under section 17a(2) of the Bankruptcy Act (11 U.S.C. § 35(a)(2))[1] and for a judgment against the bankrupts. The Referee in Bankruptcy (hereinafter "Referee") awarded a nondischargeable judgment in favor of appellee against appellants Roy A. Vaughan and Thomas Amador[2] in the amount of $11,955.36 plus interest and attorney's fees of $1,195.54. The district court affirmed the Referee's decision. We affirm.[3]
 
 
 2
 As found by the Referee, appellants Roy A. Vaughan and Thomas Amador purchased an established grocery store on or about September 30, 1972, from appellee, along with its furniture and fixtures, inventory (wholesale value of $23,209.23), good accounts receivable of $15,559.84, rolling stock, automotive equipment, goodwill, and cash of $5,000. The purchase price was $56,000, evidenced by a promissory note. Vaughan, Amador, and a third partner, George Michelle, gave appellee a security interest in the assets which they had purchased, including any inventory that might later be purchased, and also agreed to maintain the inventory at the level at the time of sale. In the event the inventory dropped below this level, appellee had a right to possession of all collateral.
 
 
 3
 On or about April 6, 1974, pursuant to agreement of the parties, appellee repossessed those assets remaining on the premises of the grocery store. Upon repossession, appellee found a total of $89.49 cash, inventory (wholesale value) of $11,243.87, and $9,690.64 in accounts receivable of which $1,000 were bad. The value of all other collateral was $7,500. Thus, total collateral repossessed amounted to $27,524. The balance due on the promissory note was $50,166.46, and appellee had to pay utility bills for the store amounting to $728.73. Accordingly, were it not for the bankruptcy, appellee would have been entitled to a judgment in the amount of $23,371.19.[4]
 
 
 4
 The Referee further found that the amount of indebtedness incurred and the decrease in inventory and in accounts receivable was "so excessive" that the mere term "negligent mismanagement" would be inappropriate to describe it and that a prima facie showing had been made that appellants had willfully and maliciously decreased the secured assets, dissipating the proceeds from such assets for their own use, so that appellee was unable to repossess all of the collateral; that the prima facie showing had not been overcome by appellants; and that, of the amount owing appellee, $11,955.36[5] was the direct result of the willful and malicious decrease in inventory.
 
 
 5
 The Referee concluded that all purchasers were partners and that if any partner willfully and maliciously converted property of appellee, such an act would constitute for all partners a nondischargeable debt under section 17a(2) of the Bankruptcy Act; that the decrease in inventory constituted a willful and malicious conversion of collateral pledged to appellee for purposes of that section; that the decrease in inventory constituted a violation of section 40A-16-18, N.M.Stat.Ann. (1953 Comp., as amended);[6] that, because appellee was unable to repossess all collateral pledged to him, the provisions of section 50A-9-505(2), N.M.Stat.Ann. (1953 Comp.)[7] did not apply; and that the provisions of said section are for the Benefit of secured parties and would not be applied since to do so would permit appellants to benefit from their wrongful disposition of assets pledged to appellee.
 
 
 6
 Appellants argue that, in the absence of a finding that appellee was the owner of the property involved, the Referee erred in concluding that they had willfully or maliciously converted property of appellee. To this argument, the district court merely stated that appellee "had the right of repossession." Perhaps more precisely, we would point out that appellee had a security interest in, among other assets, the inventory, the level of which appellants had agreed to maintain at $23,209.23. When the inventory was sold down to below that level, appellee's security interest in the inventory was converted to that extent. See In re Vines, 430 F.Supp. 465 (D.C.Ala.), Aff'd, 560 F.2d 1022 (5th Cir. 1977). It is to be borne in mind that a bankruptcy court is essentially a court of equity, and its proceedings are inherently proceedings in equity. Young v. Higbee Co., 324 U.S. 204, 214, 65 S.Ct. 594, 599, 89 L.Ed. 890, 898 (1945); Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, 1232 (1934). Substantial right and justice, rather than technical form, control. Jones v. Kendall, 34 F.2d 344, 347 (4th Cir. 1929).
 
 
 7
 Appellants next assert that the Referee erred in awarding a judgment in favor of appellee notwithstanding appellee's failure to sell the collateral which secured their debt, as provided for in section 50A-9-504, N.M.Stat.Ann. (1953 Comp.).[8] On the basis of the findings of the Referee set forth above, it is clear that the total collateral repossessed was worth roughly half the amount owing appellee, so that selling it would have been an empty gesture insofar as avoiding the amount of the judgment is concerned. Moreover, the judgment itself was based on the depletion of the inventory, and the goods sold by appellants in depleting the inventory obviously could not have been repossessed and sold. Appellants' point that, in failing to sell the repossessed collateral, appellee elected under section 50A-9-505(2), N.M.Stat.Ann. (1953 Comp.), "to retain the collateral in satisfaction of the obligation" ignores the fact, found by the district court, that appellants' own acts forced appellee to make that election.[9] To apply section 50A-9-505 under such circumstances to enable appellants to avoid the consequences of their wrong doing (See note 6, Supra ) would be incompatible with not only the spirit of the statute but with the equity that must characterize bankruptcy proceedings.
 
 
 8
 Appellants further argue that, in the absence of a finding that the alleged conversion occurred within the scope of the partnership, the Referee erred in concluding that if any partner willfully and maliciously converted property, such conversion constituted for all partners a nondischargeable debt under 11 U.S.C. § 35(a)(2). This argument is bottomed on appellants' theory that (1) it was their partner, Michelle, who had left the partnership in the later part of 1973, who was responsible for any wrongful conversion because, so they say, there is no evidence showing that either of appellants was personally responsible for any conversion; and (2) Michelle's conversion would have been to his own use and outside the scope of the partnership. The fatal flaw in this argument is the Referee's finding that most of the depletion in the inventory occurred in the three months prior to repossession by appellee during which time appellants were running the business.[10] Appellee testified that the inventory was being depleted over at least four or five months, "or maybe more," and with Michelle having left on October 14, 1973, it would not be unreasonable to conclude that all of the depletion in the inventory occurred when appellants were running the business.[11] Indeed, appellant Vaughan testified that in December of 1973 the level of inventory fell below what was on hand at the time of the sale of the business.
 
 
 9
 Finally, appellants argue that the Referee erred in finding that appellee had established a prima facie case of willful and malicious conversion and, additionally, in placing upon appellants the burden of establishing their innocence, citing Rule 407 of the Rules of Bankruptcy[12] and the Advisory Committee Note to that rule.
 
 
 10
 Depending upon the circumstances, of course, there is no question but that a conversion can be found to have been willful and malicious. McIntyre v. Kavanaugh, 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916). Here the only excuse offered for the depletion of the inventory was that appellants had to go on a cash basis in their acquisition of inventory items. However, as the district court found, this was a situation of their own making, and the evidence of a continued and accelerated wasting of assets, without appellee's authority or consent, while withholding information from appellee regarding the true condition of the business, was sufficient to permit an inference of willful and malicious conversion. Appellants presented no evidence showing that they had provided appellee with records or other information indicating that they were depleting assets covered by his security interest. 11 U.S.C. § 32(c)(2). Also, as pointed out earlier in this opinion, the Referee found that the decrease in inventory and in accounts receivable was so excessive that the mere term "negligent mismanagement" would be inappropriate to describe it. Accordingly, we hold that a prima facie case of willful and malicious conversion was established by appellee.
 
 
 11
 Appellants' point that they were placed under a burden of proving their innocence contrary to Rule 407 is not well taken. Appellee met the requirement of Rule 407 by producing evidence sufficient to establish a prima facie case of willful and malicious conversion. Thereupon, the burden was on appellants to come forward with evidence showing, for example, that there was no conversion or, if there was conversion, that it was not willful and malicious. Gardner v. American Century Mortgage Investors, 577 F.2d 928 (5th Cir. 1978); In re Mascolo, 505 F.2d 274 (1st Cir. 1974); Feldenstein v. Radio Distributing Co., 323 F.2d 892 (6th Cir. 1963); American National Bank of Denver v. Rainguet, 323 F.2d 881 (10th Cir. 1963); Weinstein v. Nussbaum, 302 F.2d 24 (2d Cir. 1962). There is nothing in the Advisory Committee Note to Rule 407 which relieves appellants from coming forward with evidence to rebut the prima facie case established by appellee. The Advisory Committee Note states:
 
 
 12
 This rule does not deal with the burden of going forward with the evidence. . . . the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of such considerations as the difficulties of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector.
 
 
 13
 Evidence to establish the fact that there was no conversion or, if there was conversion, that it was not willful or malicious was peculiarly accessible to appellants, who were in a position to know what happened to monies received from depletion of the inventory and to maintain records reflecting the disposition of assets subject to appellee's secured interest. The conclusion of the Referee and of the district court that appellee's prima facie case was not overcome by appellants is clearly correct.
 
 
 14
 We are satisfied that the findings of the Referee and of the district court referred to in this opinion are not clearly erroneous. Fed.R.Civ.P. 52(a).
 
 
 15
 The judgment is affirmed.
 
 
 
 *
 The Honorable Jack R. Miller, Judge of the United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 11 U.S.C. § 35(a) provides, in pertinent part:
 A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as
 . . . .
 (2) are . . . for willful and malicious conversion of the property of another;
 We note that the phrase "conversion of the property of another" was substituted for "injuries to the person or property of another" by Pub. L. 91-467, 84 Stat. 992 (1970). However, it had long been considered that conversion of property constituted an injury to property. Davis v. Aetna Acceptance Co., 293 U.S. 328, 332, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).
 
 
 [2]
 The complaints were dismissed as to Virginia Vaughan and Jo Ann Amador
 
 
 [3]
 On joint motion of the parties, these appeals have been submitted on the briefs
 
 
 [4]
 The referee noted that, during operation of the store by appellants, debts were incurred in excess of $15,000; also, that most of the decrease in inventory occurred during the three months preceding the repossession
 
 
 [5]
 We note that the decrease in inventory from $23,209.23 to $11,243.87 is $11,965.36
 
 
 [6]
 Section 40A-16-18, N.M.Stat.Ann. (1953 Comp., as amended), provides as follows:
 Improper sale, disposal, removal or concealing of encumbered property consists of any person knowingly, and with intent to defraud, selling, transferring, removing or concealing, or in any manner disposing of, any personal property upon which a security interest, chattel mortgage or other lien or encumbrance has attached or been retained, without the written consent of the holder of such security interest, chattel mortgage, conditional sales contract, lien or encumbrance.
 . . . .
 Whoever commits improper sales, disposal, removal or concealing of encumbered property where the value of such property exceeds twenty-five hundred dollars ($2,500) is guilty of a third degree felony.
 
 
 [7]
 Section 50A-9-505(2), N.M.Stat.Ann. (1953 Comp.), provides as follows:
 In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. . . . In the absence of such written objection (by the debtor or any other secured party) the secured party may retain the collateral in satisfaction of the debtor's obligation.
 
 
 [8]
 Section 50A-9-504, N.M.Stat.Ann. (1953 Comp.), provides that a secured party after default May sell or otherwise dispose of any or all of the collateral, and the proceeds shall be applied to reasonable expenses of retaking the collateral and to satisfaction of the indebtedness secured; further, that the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency
 
 
 [9]
 Appellee testified that
 I think the 6th of April, I opened up the back door and observed that both Roy (Vaughan) and Tommy (Amador) were sitting in the truck out there, and this was after opening time. And they came over to the house, Roy handed me the keys and he says they're quitting, they can't make a go of it, and I told them, I says, "You're laying yourselves in for a lot of trouble." I says, "Get on over there and I'll help you, " Talked to them a few minutes along this line. Tommy seemed to be rather willing to do so, but Roy actually nixed it, shook his head very affirmedly and would not go along with it. So it only left one alternative there, we just left the business closed until I reopened it about a week later.
 . . . .
 That was the only alternative I had there, really. He handed me the keys, and that was it.
 
 
 [10]
 The $11,243.87 wholesale value of the inventory upon repossession represents $704.39 for meat plus grocery items of $14,052.63, valued at retail, as compiled by the Albuquerque Inventory Service, reduced (in appellee's own handwriting) by $3,513.15 to reflect a one-third markup from the wholesale value of $10,539.48. As of January 3, 1974, total inventory of grocery items, valued at retail, as compiled by the Albuquerque Inventory Service, was $20,650.26; reducing this by $5,162 to reflect a one-third markup would yield a wholesale value of $15,488. The value of meat on hand was not shown on this inventory, but appellant Vaughan testified from work sheets in evidence that it was $2,597.79. Adding this in would yield a total inventory of $18,085.79. Thus, during the first three months of 1974 (the last three months of the partnership), inventory was depleted to the extent of over $6,800
 
 
 [11]
 It is noted that a copy of the federal partnership return of income (Form 1065) for 1973 reports a 12/31/73 inventory of $23,368, with a notation that the method of valuing inventory is "cost." When this is compared with the $11,243.87 wholesale value of the inventory upon repossession, the difference even exceeds the nondischargeable judgment of $11,955.36. The return contains a notation that Michelle withdrew from the partnership on October 14, 1973
 
 
 [12]
 Rule 407 provides:
 At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the facts essential to his objection.